UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHAMPION TRANSPORTATION SERVICES,
INC., D/B/A CHAMPION LOGISTICS GROUP,

  Plaintiff,

  v.

LEXINGTON INSURANCE COMPANY,

  Defendant.

No. 12 C 9364

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Champion Transportation Services, Inc., alleges that Lexington Insurance Company improperly denied a claim under the policy Champion has with Lexington after certain cargo that Champion was transporting was stolen en route. R. 1. The parties have both moved for summary judgment. R. 21; R. 22. For the following reasons Champion's motion is granted in part and denied in part, and Lexington's motion is denied.

**Background**

Champion is a licensed motor carrier and freight forwarder, R. 26 ¶¶ 2-3, meaning that it is in the business of providing cargo transportation services to its customers. *Id.* ¶ 4. Lexington issued an insurance policy to Champion that covered loss of cargo from June 30, 2010 to June 30, 2011 (the "Policy"). *Id.* ¶¶ 7-8. The Policy was in effect when the loss at issue in this case occurred. *Id.* ¶ 10.

In or around March 2011, Champion entered into an agreement to arrange to ship cargo for Lithographix. *Id.* ¶¶ 11-13.[1] The cargo consisted of 69,120 Annual Reports for the Exelon Corporation for the year 2010. *Id.* ¶ 16. Champion also shipped toys and apparel for two other clients in the same shipment with the annual reports. *Id.* ¶¶ 11, 14-15. The cargo was stolen while in transit. *Id.* ¶ 22. The theft was reported on March 18, 2011. *Id.* ¶ 23. Lithographix submitted a "Damage Claim Form" to Champion dated April 28, 2011 that claimed the cost of the annual reports was $178,986. *Id.* ¶ 29-30. Champion paid $178,986 to Lithographix, *id.* ¶ 42, based on an invoice from Lithographix that itemized the cost of replacing the annual reports as follows: $39,434.50 for paper; $53,277.85 for printing; $33,858.75 for bindery; $17,884.30 for materials; $6,150 for alterations; and $28,380.60 for "travel expenses/client fees." *See* R. 26-2 at 8-9. Kurt Novak, a sales representative for Lithographix who is familiar with the annual reports at issue here, testified that the cost described as "alterations" was incurred because a different kind of paper had to be used for the replacement reports, *see* R. 26-2 at 20:20–22:7, 25:7–26:5, and the cost described as "travel expenses/client fees" was incurred to pay the design firm that worked on the project. *See* R. 26-2 at 26:20–29:4. Champion then submitted the Lithographix claim to Lexington, along with claims from the other two companies whose cargo was also stolen. R. 26 ¶¶ 26, 28, 31.

---

[1] Champion provided this service through agreements with Champion's agent, AP Express, who arranged for the delivery with another carrier, LNN Transport. R. 26 ¶¶ 20-21. The fact that Champion subcontracted its services is not an issue on this motion.

2

Lexington paid the claims of the two companies not at issue here, *id.* ¶¶ 26, 28, but denied the Lithographix claim. *Id.* ¶ 32. Lexington denied the claim based on the Policy's "Freight Forwarder Form," section 3(C), which provides:

> 3. <u>PROPERTY EXCLUDED THIS POLICY DOES NOT COVER</u>.
>
> . . . .
>
> (C) ACCOUNTS, BILLS, DEEDS, EVIDENCES OF DEBT, CURRENCY, MONEY, SECURITIES, NOTES, LETTERS OF CREDIT, BULLION, PRECIOUS STONES, JEWELRY OR OTHER SIMILAR VALUABLES; PAINTING, STATUARY OR OTHER WORKS OF ART; PASSPORTS, TICKETS, DOCUMENTS, MANUSCRIPTS, RECORDS OR OTHER VALUABLE PAPERS;

R. 26-1 at 68.[2] Lexington contends that the annual reports are "documents," and thus are excluded from the Policy's coverage. R. 26 ¶¶ 33-34.

The Policy also provides that the "value of covered property at the time of the 'loss' will be its Actual Cash Value (defined as replacement cost less depreciation and obsolescence)." R. 26-1 at 15. The Policy further provides that "[i]n the event of 'loss' [Lexington] will pay . . . [t]he shippers cost of repairing or replacing the Covered Property." *Id.*

In addition to denying the claim in its entirety, Lexington also asserted that the specific losses itemized by Lithographix would not be covered even if the annual

---

[2] Champion does not dispute that this section is applicable to this motion. The parties agree that none of the other exclusion categories listed in section 3(C) are at issue. R. 26 ¶¶ 35-37.

3

reports were cargo covered by the Policy. Lexington denied the claim as it relates to charges for "paper, printing, bindery, materials, alterations, travel expenses and client fees," R. 26 ¶¶ 38-39, based on the Policy's "Freight Forwarder Form," section 8(A), which provides:

> 8. PERILS EXCLUDED
>
> THIS POLICY DOES NOT INSURE AGAINST:
>
> (A) DELAY, LOSS OF MARKET, LOSS OF USE, INTERRUPTION OF BUSINESS, OR ANY OTHER INDIRECT OR CONSEQUENTIAL LOSS OF ANY KIND, HOWEVER CAUSED.

R. 26-1 at 69. Lexington's brief, however, clarifies that, if the Court should find that the annual reports are not excluded from coverage under the Policy, it only seeks to avoid payment of the costs for "bindery," "alterations," and "travel expenses/client fees." *See* R. 23 at 10. The parties agree that the Lithographix claim does not include any claim resulting from any "delay, loss of market, loss of use or interruption of business which may have resulted from this loss." R. 26 ¶ 40. Lexington, however, contends that the charges for "bindery," "alterations," and "travel expenses/client fees" are "consequential losses" excluded from coverage under the Policy. R. 23 at 9-10.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

4

322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Analysis**

**I.    "Documents"**

Lexington argues that the "annual reports are 'documents' in the clearest sense of the word," and thus, are excluded from the Policy's coverage. R. 23 at 7. In support of this argument, Lexington cites the definition of "document" in Webster's Dictionary. *Id.* Webster's defines "document" as "a writing conveying information." *See* Merriam-Webster online, www.merriam-webster.com (last visited Apr. 21, 2014); *see also* Oxford English Dictionary online, www.oed.com (defining "document" as "something written, inscribed, etc., which furnishes evidence or information") (last visited Apr. 22, 2014). Certainly, Lexington is correct that the annual reports at issue here are "documents" in the broad sense provided by these dictionaries.

Yet, the Policy does not leave the term "document" to the broad dictionary definition as Lexington would have it. Although the Policy does not include an

5

express definition of the term "document," the Policy exclusion at issue here includes the following: "passports, tickets, documents, manuscripts, records or other valuable papers." R. 26 ¶ 34. This language from the Policy functions to categorize and define "documents" as a type of "valuable papers," and thus, "documents" should be interpreted to comport with the other examples of "valuable papers" provided by the Policy. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2171 n.19 (2012) ("The canon of *ejusdem generis* limits general terms [that] follow specific ones to matters similar to those specified.") (internal quotation marks omitted). "Documents," as that word is used in the Policy, are limited to "valuable papers" similar to "passports, tickets, manuscripts and records." Based on these examples, it is clear that "valuable papers" are kinds of "papers" that are unique and potentially irreplaceable, and have some value beyond their mere material production value. It is true that in our digital age, original hard-copy papers have lost much of their unique value, as another copy from the digital "original" can often times be easily reproduced. But the examples of "valuable papers" provided by the Policy in this case clearly show that "documents" is not meant to include just any "writing conveying information," as Lexington suggests with reference to the dictionary; rather, a paper writing that is unique and has value beyond the paper it is printed on.

Lexington argues in response that the annual reports must be "valuable," otherwise "'no liability claim could be made because the owner of the documents would not have sustained a loss.'" R. 23 at 9 (quoting *Sentry Ins. v. Jim Pointek*

6

*Trucking*, 1997 Wisc. App. LEXIS 148, at *7 (3d Dist. Feb. 18, 1997)). This argument, of course, conflates the common use of the word "value" with its specific application in the Policy's term "valuable papers." As Lexington points out, all the cargo that Champion ships has some commercial value, otherwise Champion would not require insurance. By excluding "valuable papers," however, the Policy clearly carves out a certain category of "papers"—and by extension, "documents"—that have value beyond their commercial or replacement value, and hence are "valuable" for purposes of the Policy.

Notably, in the *Sentry Insurance* case Lexington relies on, the papers at issue were "computer printout sheets" containing "information" the owner intended to sell to its customers. 1997 Wisc. App. LEXIS 148, at *2. Thus, the documents at issue in *Sentry Insurance* had a value beyond the paper and ink and time necessary to create them, making them "valuable papers" rather than mere "papers." *Id*. Here, by contrast, Lexington does not contend that the annual reports were in any way unique; in fact, the record shows that they were easily reproduced. Moreover, the inclusion of "valuable papers"—including "documents"—in the same exclusion provision of the Policy as "currency," "money," and "works of art" also shows that the intent of the Policy is to exclude unique or irreplaceable items, as opposed to mass-produced documents. If Lexington's interpretation of "documents" is correct, any mass-produced paper with writing on it—for instance textbooks—would fall into the exclusion. This would not be reasonable. There is nothing irreplaceable about mass-produced textbooks. They merely have to be reprinted from the original

7

manuscript. Therefore, the annual reports are not "documents" for purposes of the Policy, and they are not excluded from the Policy's coverage.

## II. Consequential Losses

Lexington argues that the costs for "bindery," "alterations," and "travel expenses/client fees" are "consequential losses" excluded by the Policy. *See* R. 23 at 10. The Policy provides the following four examples of "consequential loss": delay; loss of market; loss of use; or interruption of business. These examples show that "consequential loss" relates to losses that occur because the cargo was not delivered on time. *See Christopher*, 132 S. Ct. at 2171 n.19. Moreover, the Policy provides that Lexington will pay the "replacement cost" of the loss, R. 26-1 at 15, and the Policy describes "consequential loss" as "indirect." R. 26-1 at 69. Clearly, the plain terms of the Policy show that "consequential loss" does not include any cost necessary to directly replace the cargo itself.

Lexington argues that only the costs of the "materials which comprise" the replacement cargo are covered, whereas the costs "relate[d] to services required for the preparation" of the replacement cargo are not covered. *See* R. 23 at 10. Notably, Lexington does not cite any provision of the Policy in making this argument. The Policy clearly states that Lexington will cover the "replacement cost" of the loss. R. 26-1 at 15. Lithographix's representative explained how the costs itemized in the $178,986 invoice were necessary to replace the annual reports. Thus, Lexington must pay Champion the $178,986.

8

## III. Attorneys' Fees and Costs

Champion argues that Lexington's denial of the Lithographix claim was "vexatious and unreasonable" such that the Court should award attorneys' fees and costs to Champion pursuant to 735 ILCS 5/155. R. 24 at 13-14. Champion's only reasoning in support of its argument for fees and costs is the "fact that Lexington paid the other two claims but denied this claim demonstrates its bad faith in denying this claim." R. 24 at 14.

"An insurer's actions are not vexatious and unreasonable if '(1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law.'" *TKK USA, Inc. v. Safety Nat. Cas. Corp.*, 727 F.3d 782, 793 (7th Cir. 2013) (quoting *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000)). Lexington's arguments can be characterized by the first of the Seventh Circuit's examples, in that Lexington disputes "the scope and application of insurance coverage," *TKK*, 727 F.3d at 793, with reference to an express exclusion in the Policy. Holding that such an argument is unreasonable would unreasonably chill insurance companies' willingness to defend against claims they believe are not covered by the express terms of a policy. Moreover, Lexington's decision to pay certain claims under the Policy arising out of the same theft that caused the Lithographix loss is not evidence that Lexington acted unreasonably, as Champion would have it. Neither of

9

those two claims (for toys and apparel) could plausibly have fallen into the "documents" exclusion, and Champion does not argue that there was any other Policy exclusion potentially applicable to either claim, which Lexington ignored. Rather, Lexington's argument that the "documents" exclusion applies to the annual reports, but not the other two claims, tends to show that Lexington made a reasoned determination that the Policy only covered two of the three claims. Therefore, Champion's motion for fees and costs is denied.

**Conclusion**

For the foregoing reasons, Champion's motion, R. 21, is granted in so far as the Court has interpreted the Policy in Champion's favor, and denied with respect to Champion's motion for attorneys' fees and costs; and Lexington's motion, R. 22, is denied.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: April 22, 2014